IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SHALAY A. PETERSON, Individually and as Prochein Ami for ISLAM Y.I.S. PETERSON, a Minor, and DWIGHT PETERSON, | ) ) ) ) ) | CIVIL NO. CV05-00465 DAE/BMK (Medical Malpractice) |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| UNITED STATES OF AMERICA, | ) ) ) | |
| Defendant. | ) ) ) ) | |

_____

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried before the Court on August 15 through August 16, 2006, as well as on August 24, 2006, during a site visit by the Court and counsel in San Antonio, Texas at Fort Sam Houston.  The parties appeared personally and through their representatives and attorneys of record.  The Court has considered the record evidence submitted, made determinations as to relevance and materiality, assessed the credibility of the witnesses, and ascertained the probative significance of the documentary and visual evidence presented.  Upon consideration of the above, the Court finds the following facts to have been proved by a preponderance

of the evidence, and in applying the applicable law to such factual findings, makes the following conclusions of law.

      1.    This is a medical malpractice, personal injury action brought by Plaintiffs Shalay A. Peterson, individually and as Prochein Ami for Islam Y.I.S. Peterson, a minor, and Dwight Peterson.

      2.    This action is brought against the United States under the Federal Tort Claims Act, 28 U.S.C. §§1346(b), 2671 et seq., alleging that the care and treatment provided at Tripler Army Medical Center ("Tripler") on January 14, 2005, to Islam Y.I.S. Peterson ("Izzy") fell below the requisite standard of care and that as a result of this breach by Tripler of its duty of care, Izzy suffered severe brain damage caused by inadequate oxygenation, with resulting consequences.

      3.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §1346(b).  Venue is proper pursuant to 28 U.S.C. §1402(b).

      4.    Pursuant to Title 28, U.S.C. §2671, et seq., administrative claims on behalf of Plaintiffs were filed on January 26, 2005, with the Department of the Army.  The instant lawsuit was filed on July 27, 2005, after Defendant United States of America had failed either to admit or to deny said administrative claims within six months of the filing thereof.

5.      Plaintiffs have complied with all jurisdictional and procedural prerequisites to suit.  Plaintiffs have timely and properly presented their claims under the Federal Tort Claims Act to the appropriate Federal agency.

6.      Plaintiffs Shalay A. Peterson, born May 31, 1974, and Dwight Peterson, born September 17, 1973, are Izzy's natural mother and natural father, respectively.

7.      At all times relevant to this action, Plaintiffs Shalay A. Peterson, Dwight Peterson and Izzy were domiciled in and citizens of the City and County of Honolulu, State of Hawaii, and currently reside in San Antonio, Texas.

8.      Plaintiff Shalay A. Peterson was duly appointed as Prochein Ami of Islam Y.I.S. Peterson for the purpose of representing the interests of Izzy in any legal actions arising out of the January 14, 2005 incident in which Izzy was severely injured as a result of medical malpractice, by Ex Parte Order Appointing Prochein Ami filed on July 27, 2005, by the Honorable Randall K.O. Lee in Special Proceeding No. 05-1-0298, in the Matter of the Protection of the Property of Islam Y.I.S. Peterson, in the Circuit Court of the First Circuit, State of Hawaii.

9.      The United States of America, through its agency, the Department of the Army, at all times relevant herein, owned, operated and controlled the hospital known as Tripler Army Medical Center ("Tripler"), located in Honolulu, Hawaii.

10.     The United States of America, through its agency, the Department of the Army, staffed the Tripler facility with its employees.

11.     Izzy was born on January 14, 2005, at approximately 8:10 a.m. at Tripler.  At birth Izzy was a healthy, normal baby boy, weighing approximately 7 pounds, 5 ounces, without brain injury or damage and without cerebral palsy and/or spastic quadriplegia.

12.     Tripler physicians began to give Izzy "oxygen" by mask at approximately one minute of life.

13.     Tripler physicians discovered at approximately 8:52 a.m., 41 to 42 minutes after "oxygen" was started, that the "oxygen" mask tubing was in fact connected to a carbon dioxide ($CO_2$) tank and not to an oxygen tank.

14.     For approximately 41 to 42 minutes, from 8:10-8:11a.m. until 8:52 a.m., Izzy was breathing carbon dioxide and was not breathing oxygen.

15.     At all times material hereto, all persons involved in the administration of carbon dioxide to Izzy were agents, servants and/or employees of the Department of the Army, the United States of America or some other agency thereof.

16.     This case involves claims by the Plaintiffs that the administration to Izzy of carbon dioxide by the Tripler physicians on January 14,

4

2005 was negligent, and the proximate and legal cause of all the injuries and damages claimed.

17.    The Defendant United States of America has specifically admitted liability as to all of Plaintiffs' claims.  Proximate and legal causation of all damages incurred are likewise admitted.

18.    Shalay and Dwight Peterson were married on October 15, 1995, the first marriage for both.  Shalay and Dwight had two children together before Izzy was born, daughter Siani Peterson and son Saion "Bubba" Peterson.  Siani was born on May 25, 1994 and is 12 years old.  Saion was born on September 27, 1995 and is 11 years old.

19.    Shalay Peterson also has an older son, Ian Wiley.  Ian was born on July 10, 1990.  He is 16 years old and resides with Shalay Peterson's mother in Philadelphia, Pennsylvania.

20.    Shalay Peterson underwent a tubal ligation in 1995 after Saion was born.  Shalay and Dwight Peterson wanted a third child together, so Shalay Peterson underwent surgery in 1999 to reverse the tubal ligation.  Three in-vitro fertilization attempts followed.  The first attempt resulted in a miscarriage.  The second attempt resulted in a failure of conception.  Following that failure, Shalay underwent myomectomy surgery to increase the prospect for successful in-vitro fertilization.  Izzy was the result of a third in-vitro fertilization attempt.

21.    Izzy was delivered on January 14, 2005, by routine elective caesarean section surgery, performed without complication.  The c-section was performed to avoid the risk of complications potentially associated with Shalay's previous uterine surgery (the myomectomy).

22.    Dwight Peterson was present in the operating room for Izzy's delivery and he videotaped the birth of his son.  Dwight's video graphically shows a healthy Izzy at delivery with a spontaneous cry and captures the images of Izzy trying to brush away with his hand the "oxygen" mask that was delivering the carbon dioxide to his brain, and at the same time robbing him of life-sustaining oxygen.

23.    Dwight Peterson was present during the entire time that Izzy was receiving carbon dioxide and undergoing resuscitation efforts.  Shalay Peterson's caesarean section surgery was performed under a spinal anesthesia. Shalay was awake and alert at the time her son Izzy was born.  Although Shalay Peterson could not see what was happening to her son, she could hear the verbal orders and comments being made by medical personnel during Izzy's resuscitation. With her medical background and knowledge, Shalay understood that her son Izzy's life and future health was severely at risk.  Observing her obvious distress in response, Shalay's anesthesiologist asked her if she wanted anesthesia "so that she could forget" what was happening to her son during his resuscitation.  Shalay was

so upset by these events happening to Izzy in the operating room that she accepted the offer of a general anesthesia so that she would not have to continue to be exposed to Izzy's resuscitation.

24.    The substandard and negligent medical care provided to Izzy on January 14, 2005, resulted in severe brain damage to him.

25.    Specifically, Izzy suffers from the following neurological deficits and disorders resulting to his brain from the asphyxial episode:  (a) a motor disorder commonly known as cerebral palsy and medically termed spastic quadriplegia; (b) facial nerve paralysis; (c) an inability to swallow normally; (d) loss of bowel and bladder control resulting in incontinence; and (e) a movement disorder characterized by both spasticity and dystonia.

Although initial evaluations concluded that Izzy had cortical blindness, Dr. Andrea Morrison's latest examination on July 21, 2006, showed that Izzy could fix his eyes upon and follow to left and right a silent silvery toy placed 8 to 10 inches in front of him.  This suggests that Izzy sees and tracks visually, since he could not follow the toy by sound, and by a preponderance of the evidence, the Court so finds.

26.    Izzy's condition requires a tracheostomy.  Izzy has his respirations supported by a ventilator attached to his tracheostomy, although he is able to breathe spontaneously above the ventilator rate when he is awake.  The

7

ventilator is required due to episodes of sleep apnea sometimes causing Izzy not to breathe spontaneously when he is sleeping.

27.   Izzy has a gastrostomy and receives all feedings through a gastrostomy tube, with no food intake by mouth.

28.   Izzy does not have normal or near-normal intelligence, and doesn't react to the stimuli he receives daily.  Therefore, it is humanly impossible to fully evaluate Izzy's mental status due to his age and severe disability.

29.   Izzy's brain damage, its neurologic sequelae and other consequences are permanent and irreversible.  Izzy has suffered these impairments from the day of his birth and will continue to suffer these impairments until the end of his lifetime.

30.   Izzy suffers from no permanent bodily medical condition unrelated to his brain injury and damage.

31.   As a result of his brain injury and damage and its neurological sequelae, Izzy is totally dependent and will require full time 24-hour nursing care every day for the remainder of his life.  Because Izzy is tracheostomy and ventilator dependent, and has a gastrostomy tube for all feedings, his care must be provided by registered nurses (R.N.s) and/or licensed practical nurses (L.P.N.s) specially trained in tracheostomy and ventilator patient care.

32.     Izzy has received superior 24-hour nursing care since the day he was born.  Izzy was hospitalized in the neonatal intensive care unit (NICU) at Tripler from January 14 until July 22, 2005, when the Peterson family was reassigned to San Antonio, Texas.  Upon relocation, Izzy was initially hospitalized at Brooke Army Medical Center in San Antonio.  Since August 2005, Izzy has been cared for at home by his family with the aid of excellent 24-hour nursing care provided by R.N.s and tracheostomy-care-trained L.P.N.s., all paid for by the United States.

33.     As a result of his injuries, Izzy's life expectancy has been shortened.  The most convincing evidence establishes that if Izzy's current level of care is sustained, he has a life expectancy of 27 years.  This is based on the whole record in this case, the Court's careful view of the record, and the credibility of the witnesses.

34.  Izzy's hospitalization for respiratory complications, including pneumonia, on February 6, 2006, and his short hospitalizations for status epilepticus on May 26, 2006 and July 10, 2006 are understandable complications anticipated because of Izzy's initial brain injury.  The evidence does not establish that additional brain injury or other physiologic changes were caused by these episodes of pneumonia and seizures.  The Court finds that the likely cause of these seizure episodes was Izzy's subtherapeutic levels of anti-seizure medication

9

existing at the time of onset of these seizures.  These episodes of pneumonia and status epilepticus do not establish a further shortening of Izzy's life expectancy.

35.    Since July 10, 2006, Izzy's ventilator rate settings have twice been lowered, indicating that Izzy is breathing more on his own with less support from the ventilator.  Izzy's ability to breathe more on his own suggests no further injury to his brain or respiratory function resulted from these episodes of pneumonia and status epilepticus.

36.    Had Izzy not been injured, his statistical life expectancy would be 68 years.

37.    Izzy has no true motor skills.  All four of his extremities are impaired.  Izzy will never walk.  He requires a wheelchair for transport.  He is incontinent and will remain incontinent for his entire life.

38.    Izzy has no ability to care for himself.  He will be unable to take care of himself during his entire lifetime.  He will require constant assistance in his daily care as long as he lives.  The likelihood is that Izzy will never talk.

39.    Izzy is of course incapable of ever being employed.

40.    The Court finds that the Life Care Plan of Sharon Kawai, M.D., provides for the requisite nature and quality of care envisioned for Izzy and has support from his treating physicians and those physicians who have examined him regarding his care needs.

41.     Both sides' expert witnesses agree, and the Court finds, that Izzy requires 24-hours a day care for the rest of his life.  Both sides' expert witnesses agree, and the Court finds, that it is appropriate, reasonable and necessary that that care be provided for 24-hours daily by R.N.s and/or tracheostomy-care-trained L.P.N.s.

42.     The Defendant has suggested that certain services which Izzy will require would be provided without cost if Izzy attended school.  However, based upon the uncontroverted expert testimony, the Court finds that Izzy will not benefit from school, and by attending school Izzy would be unnecessarily exposed to the risk of infection, disease and other conditions which would cause serious and life-threatening complications for Izzy, such that attending school is not a feasible option for Izzy.

43.     Based upon the expert testimony and evidence adduced at trial, which was largely uncontested by the Defendant, the Court finds that Izzy must be cared for 24-hours per day in an appropriate environment designed to provide him as nearly as possible with a reasonable quality of life.

44.     The Court further finds that because Izzy is profoundly handicapped, he must be provided with specialized durable medical equipment, outpatient and inpatient medical care, diagnostic testing, therapy and transportation and transfer equipment in order to receive adequate and appropriate care.

11

45.     The Court notes that the Life Care Plan submissions of the parties relating to Izzy's future life care needs are not significantly different in many critical respects.

46.     The Court further finds that Izzy will require special needs medications, respiratory supplies, bowel and bladder supplies and gastrostomy tube feeding supplies in order to receive adequate and appropriate care.

47.     Although the Life Care Plan submissions by the parties are largely similar, the Court finds that the Life Care Plan of Sharon K. Kawai, M.D., better provides for Izzy's care needs in several material respects.  First, Dr. Kawai's Life Care Plan encompasses Izzy's care needs for his full life expectancy of 27 years, as determined by this Court.  The Life Care Plan of Cathlin Vinett, R.N., provides for Izzy's care needs only for a life expectancy of five to ten years, an unrealistically low life expectancy, and thus inadequate to fully provide for Izzy's care needs as a result of his injuries.

Secondly, Dr. Kawai's Life Care Plan appropriately provides for 24-hour care for Izzy to be provided by R.N.s or trach-trained L.P.N.s, whereas Ms. Vinett's Life Care Plan inappropriately provides for Izzy's 24-hour care to be provided only by L.P.N.s, with no requirement that the care be provided by trach-trained L.P.N.s or R.N.s.

Finally, because Ms. Vinett's Life Care Plan extends only ten years into the future, it does not describe and provide for the necessary medical care, diagnostic testing, surgical procedures, therapy, medications, equipment and supplies, support care, transportation and housing and other services that Izzy will appropriately require as the result of a life expectancy longer than ten years.

48.    The only economic evidence regarding the present value costs of Dr. Kawai's Life Care Plan for Izzy is that provided in the January 9, 2006 report of Thomas A. Loudat, Ph.D.  Based on Dr. Loudat's projections, the present value cost of Dr. Kawai's Life Care Plan is $12,376,763.00 based upon Izzy's life expectancy to age 27.  The costs associated with the Life Care Plan begin on January 14, 2007, when Dwight Peterson's term of service with the United States Army expires.  At that time Defendant USA will no longer pay for the cost of Izzy's care.

In determining the present value of Izzy's future life care costs, the Court finds that Dr. Loudat utilized the appropriate interest rates and discount rates for all items set forth in the Life Care Plan and further appropriately accounted for tax consequences in his calculations.  The Court further finds the methodology utilized by Dr. Loudat to be appropriate and fair.

49.    Izzy Peterson has suffered a complete and total loss of earning capacity.  Izzy Peterson will never work.  Given the family history and

circumstances, the probability is high that had Izzy not been injured, he would have graduated from college.

Plaintiff Shalay A. Peterson obtained an Associate's Degree after two years of college and attended college thereafter for an additional year.  Plaintiff Dwight Peterson plans to return to school and become a teacher if his life's circumstances permit.  The Petersons' two older children, Siani and Saion, are both doing well in school and plan to attend college.

The Court therefore finds it appropriate and reasonable to estimate Izzy's future income based upon an assumption that Izzy would graduate from college.

50.    The Court, having duly considered the evidence and testimony in light of all other factors, finds that the present value of Izzy's damages for lost future income and fringe benefits, after consideration for income taxes, is $1,495,500, based upon formulaic calculations in the January 9, 2006 report of Dr. Thomas A. Loudat, Ph.D.

The Defendant provided the Court with an economic loss analysis based only upon educational attainment levels of a high school diploma or Bachelor's degree.  Under these circumstances, the Court finds that the higher educational attainment level of a Bachelor's degree is more appropriate than that of

a high school diploma and finds that level of earnings as calculated by Dr. Loudat to be most appropriate.

Given the educational attainment levels of Izzy's parents, the Court finds no substantial basis to use an earning capacity calculation based only upon the average earning capacity of all males who had only attained a high school education. The Court finds that Dr. Loudat's use of a college graduate level of educational attainment is the proper basis for the calculation of Izzy's lost earning capacity.

51.     The Court notes that the evidence is undisputed that Izzy is profoundly physically handicapped, with severe motor and sensory deficits, as a result of the incident which gave rise to this case. The Court further notes that Izzy will not have normal or near normal cognitive ability and function, although the precise degree of his mental retardation and cognitive impairment cannot be determined due to his age and disability.

52.     The Court further finds that Izzy's social interactions, interpersonal relationships, and prospects for living a normal life have all been destroyed or severely restricted, and that he is unlikely to marry or have a family.

53.     The Court finds that as a proximate and legal result of the Defendant's negligence, Izzy is entitled to recover general damages in the amount of $250,000.00 for his past and future mental anguish and emotional distress,

$375,000.00 for his past and future pain and suffering, $250,000.00 for his past and future loss of enjoyment of life due to his physical and cognitive impairments, $100,000.00 for his disfigurement, and $100,000.00 and for his past and future loss of parental care, companionship, society, comfort and protection.

54.    The Court finds that for Plaintiffs Shalay A. Peterson and Dwight Peterson, the quality of their parent-child relationship and their expectations of a normal family life with Izzy have been seriously impaired by Izzy's injuries and that they will be confronted with these losses each time they are with Izzy and will continually experience his diminished capacity to give comfort, society and companionship.

The Court further finds that the parent-child relationship and family life which Plaintiffs Shalay A. Peterson and Dwight Peterson share with their older children has been seriously disrupted and impacted by Izzy's condition and care needs, and the time which must be devoted to Izzy's care. This disruption of normal family life has caused additional mental anguish, emotional distress and concern for Plaintiffs Shalay A. Peterson and Dwight Peterson regarding the development and well-being of their older children and the adverse impact resulting upon their relationships with their older children.

55.    Plaintiff Shalay A. Peterson's life expectancy is 45 years. Plaintiff Dwight Peterson's life expectancy is 40 years.

16

56.     The Court finds that as a proximate and legal result of the Defendant's negligence, Plaintiff Shalay A. Peterson individually is entitled to recover damages in the amount of $375,000.00 for her suffering, mental and emotional distress, and anguish.  Plaintiff Shalay Peterson individually is also entitled to damages in the amount of $400,000.00 for the loss of care, companionship, society, comfort, protection and filial care and attention of her son Izzy.

57.     The Court finds that as a proximate and legal result of the Defendant's negligence, Plaintiff Dwight Peterson individually is entitled to recover damages in the amount of $375,000.00 for his suffering, mental and emotional distress, and anguish.  Plaintiff Dwight Peterson individually is also entitled to damages in the amount of $400,000.00 for the loss of care, companionship, society, comfort, protection and filial care and attention of his son Izzy.

58.     Plaintiffs are entitled to recover their costs as provided by law, which costs shall be taxed at a later date upon affidavit of the parties.

## CONCLUSIONS OF LAW

1.     This Court has subject matter jurisdiction over this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §1346(b) and §2671, et seq.

2.      Defendant is liable to Plaintiffs "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. §2674.

3.      Plaintiffs filed their administrative claims on January 26, 2005, under the provisions of the Federal Tort Claims Act, 27 U.S.C. §2671, et seq., and jurisdiction and venue are proper insofar as the acts and omissions alleged in the administrative claim and in the Complaint filed in the instant action occurred within the State of Hawaii.

4.      In an action brought pursuant to the Federal Tort Claims Act, the law of the state in which the alleged act occurred applies.  28 U.S.C. §2674; Mohammed vs. United States, 266 Fed.2d 198 (9th Circuit 1966), cert. denied, 386 U.S. 959 (1967).

5.      The Court concludes, based upon the Defendant United States of America's admission of liability and causation, that Defendant United States of America, by and through those healthcare providers in its employ who attended Izzy at Tripler Army Medical Center on the morning of January 14, 2005, negligently breached the requisite standard of care by administering carbon dioxide rather than oxygen to Izzy for approximately 41 to 42 minutes, from 8:10-8:11a.m. until 8:52 a.m.

6.      The Court concludes, based upon the Defendant United States of America's admission of liability and causation, that the Defendant's negligence

18

proximately and legally caused Izzy to sustain hypoxic encephalopathy, resulting in severe brain damage caused by inadequate oxygenation, with resulting consequences.  The Court further concludes that Izzy's hypoxic encephalopathy, severe brain damage and consequent injuries and disabilities would not have occurred had his post-delivery care been managed in accordance with the requisite standard of care.

       7.    Hawaii law governs the elements and measure of damages to be awarded in this case.  <u>Richards vs. United States</u>, 369 U.S. 1 (1962); <u>Shaw vs. United States</u>, 741 Fed.2d 1202 (9th Circuit 1984); <u>Yako vs. United States</u>, 891 Fed.2d 738 (9th Circuit 1989).

       8.    The Court concludes that as a proximate and legal result of the Defendant's negligence, Plaintiffs are entitled to recover damages as follows:

      a.    <u>SPECIAL DAMAGES</u>

      (1)    Lost future income and fringe benefits: $1,495,500.00

      (2)    Future life care expenses: $12,376,763.00

      b.    <u>GENERAL DAMAGES</u>

      (1)    $250,000.00 for Izzy's past and future mental anguish and emotional distress.

(2)      $375,000.00  for Izzy's past and future pain and suffering.

(3)      $250,000.00 for Izzy's past and future loss of enjoyment of life due to his physical and cognitive impairments.

(4)      $100,000.00 for Izzy's disfigurement.

(5)      $100,000.00 for Izzy's past and future loss of parental care, companionship, society, comfort and protection.

(6)      $375,000.00 for Shalay A. Peterson's suffering, mental and emotional distress and anguish.

(7)      $400,000.00 for Shalay A. Peterson's loss of care, companionship, society, comfort, protection and filial care and attention of her son Izzy.

(8)      $375,000.00 for Dwight Peterson's suffering, mental and emotional distress and anguish.

(9)      $400,000.00 for Dwight Peterson's loss of care, companionship, society, comfort, protection and filial care and attention of his son Izzy.

The law provides that Plaintiffs may recover their costs.  The Court directs the parties to file within eighteen (18) days from the date of this decision the necessary affidavits to resolve the question of the assignment of costs.

The Court also reserves any judgment regarding the placement of damages awarded for future life care expenses into a reversionary trust.  The Court hereby orders that the parties submit further briefings on the matter for the Court's review and determination.  The Court specifically retains jurisdiction over this matter to resolve this issue.

Any finding of fact which may be deemed, in whole or in part, more properly a conclusion of law shall be deemed as such, and any conclusion of law which may be deemed, in whole or in part, more properly a finding of fact shall be deemed as such.

There being no just reason for delay, the Court hereby directs entry of final judgment in favor Plaintiffs.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 24, 2006.



_____
David Alan Ezra
United States District Judge

Peterson, et al. v. United States, Civil No. CV05-00465 DAE/BMK, FINDINGS OF FACT AND CONCLUSIONS OF LAW